**2025 WI 11**

# Supreme Court of Wisconsin



OCONOMOWOC AREA SCHOOL DISTRICT,
*Petitioner-Appellant,*

*v.*

GREGORY L. COTA, et al.,
*Respondent, Respondent, Cross-Petitioner.*

No. 2022AP1158
Decided April 10, 2025

REVIEW of a decision of the Court of Appeals
Waukesha County Circuit Court (Lloyd V. Carter, J.) No.
2021CV1232

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, KAROFSKY, and PROTASIEWICZ, JJ., joined. PROTASIEWICZ, J., filed a concurring opinion. ZIEGLER, C.J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., joined.

¶1 REBECCA FRANK DALLET, J. The Oconomowoc Area School District launched an internal investigation after a coworker accused District employees Gregory and Jeffrey Cota of stealing the District's money. The investigation was inconclusive; the District determined that it was indeed missing cash but could not identify who was responsible. The District then turned the case over to local police, explaining that "[e]mployment-related disciplinary decisions c[ould] be better made following the conclusion of any criminal investigation." The police

investigation, however, revealed no new evidence connecting the Cotas to the missing money. Nevertheless, the Cotas were cited for municipal theft, a non-criminal offense. Approximately one year later, the assistant city attorney told the District that he believed he could obtain a conviction. The next day, the District terminated the Cotas' employment.

¶2     The Cotas sued, alleging that the District violated the Wisconsin Fair Employment Act's (the Act) prohibition on terminating employment because of employees' "arrest record[s]." WIS. STAT. §§ 111.321, 111.322(1) (2021–22).[1] The Act defines "arrest record" broadly to include "information indicating that an individual has been questioned, apprehended, taken into custody or detention, held for investigation, arrested, charged with, indicted or tried for any felony, misdemeanor or other offense pursuant to any law enforcement or military authority." WIS. STAT. § 111.32(1).

¶3     This case raises two questions. First, does the Act's definition of arrest record—specifically the phrase "any . . . other offense"—include non-criminal offenses, like municipal theft? Second, if so, did the Labor and Industry Review Commission (LIRC) correctly conclude that the District engaged in arrest-record discrimination when it terminated the Cotas? We answer "yes" to both questions and thus reverse the court of appeals' contrary decision.

I

¶4     Gregory and Jeffrey Cota were members of the District's grounds crew and, as part of their duties, recycled scrap metal for the District. The Cotas, along with coworker Garret Loehrer, brought scrap metal to a local processor, which paid with cash or checks made out to "cash." The person who received the money from the processor would give it to Gregory, who would then pass it along to his supervisor, Matt Newman.

¶5     Between 2012 and 2014, the Cotas made multiple complaints about Loehrer's work performance to supervisors. Some of these complaints were subsequently relayed to Loehrer. On one such occasion,

---

[1] All subsequent references to the Wisconsin Statues are to the 2021–22 version unless otherwise specified.

Jeffrey Cota asked a supervisor if Loehrer had turned in money from a recent scrap-metal delivery. The money had been turned in, but the supervisor reported the inquiry to Loehrer. In response, Loehrer accused the Cotas of retaining some of the District's scrap money. Loehrer asserted that, approximately two years prior, he and the Cotas had delivered scrap metal to the processor but had kept the payment and split the money among themselves.

¶6     The District's Director of Human Resources, Pam Casey, began a formal investigation into the allegations. Casey interviewed employees and reviewed documents related to the scrap-metal transactions. She determined that $5,683.81 originally paid to Loehrer and the Cotas had not been received by the District. But conflicting accounts given by Loehrer, the Cotas, and other employees prevented Casey from determining who was responsible for the missing funds. As Casey put it in a report summarizing the results of her investigation, "it is . . . clear that the ability of the [District] Administration to determine which employee or employees are responsible for this cash shortfall is limited by the conflicting allegations which have been produced to the District during the course of this investigation." Accordingly, Casey recommended turning over the investigation to local police, explaining that "[e]mployment-related disciplinary decisions can be better made following the conclusion of any criminal investigation." The District took no other investigatory action after turning the matter over to the police.

¶7     The Town of Oconomowoc Police Department opened its own investigation into the missing funds. The police learned that the grounds crew general manager, Newman, had cashed checks issued for the District's scrap metal at a local bar and kept the proceeds for himself. Despite investigating for 11 months, however, the police did not discover any new information related to the Cotas. Even so, the Cotas were cited for municipal theft. The investigating detective explained in her report that she based the citations exclusively on Loehrer's allegation that the Cotas had split scrap money with him on one occasion—the same allegation that had given rise to the District's investigation. The detective's report further stated that she was unable to prove any additional allegations against the Cotas.

¶8     Approximately one year after the Cotas were cited for theft, the assistant city attorney informed the District that he believed he could obtain convictions and that he also believed the case could be settled. The assistant city attorney proposed dismissing the citations against the Cotas

in exchange for a $500 payment, which he characterized as "restitution." The District indicated that it supported the proposal, but the Cotas had not agreed. The next day, the District terminated the Cotas' employment. The District sent the Cotas termination letters, drafted by Casey, stating that the District had "learned" that the Cotas "were, in fact, guilty of theft of funds from the School District" and that they had lied about this during the District's internal investigation. The municipal citations against the Cotas were ultimately dismissed.[2] The Cotas never pleaded guilty to or were convicted of municipal theft.

¶9    The Cotas filed claims of arrest-record discrimination with the Department of Workforce Development, Equal Rights Division (DWD). Following an evidentiary hearing, an administrative law judge found that the Cotas failed to establish that the District had unlawfully discriminated against them. The Cotas appealed to LIRC, which reversed, concluding that the District terminated the Cotas' employment because of their arrest records in violation of the Act. The District sought judicial review of LIRC's decision. The circuit court affirmed, concluding that LIRC's decision was supported by substantial evidence.

¶10    The District appealed. After initial briefing, the court of appeals sua sponte ordered supplemental briefing on the issue of whether the Act prohibits discrimination because of an arrest record for a non-criminal municipal offense. The court of appeals subsequently reversed LIRC's decision, holding that the Act's definition of "arrest record" includes only information related to criminal offenses—not the municipal offenses for which the Cotas were cited. *Oconomowoc Area Sch. Dist. v. Cota*, 2024 WI App 8, ¶16, 410 Wis. 2d 619, 3 N.W.3d 736.

II

¶11    When an appeal is taken from a lower court's decision reviewing an agency decision, we review the decision of the agency, not the decision of the lower court. *See Clean Wis., Inc. v. Pub. Serv. Com'n of Wis.*, 2005 WI 93, ¶36, 282 Wis. 2d 250, 700 N.W.2d 768. We therefore review LIRC's decision, not the decision of the court of appeals. Interpreting the meaning of "any . . . other offense," as it appears in §

---

[2] The stipulation and order dismissing the Cotas' citations did not mention payment of restitution.

111.32(1), is a question of law, which we review de novo. *Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611. Agency findings of fact must be upheld if they are supported by substantial evidence in the record. *Hilton ex rel. Pages Homeowners' Ass'n v. DNR*, 2006 WI 84, ¶16, 293 Wis. 2d 1, 717 N.W.2d 166; *see also* WIS. STAT. § 227.57(6).

III

¶12    Subject to limited exceptions, an employer may not terminate an employee because of the employee's arrest record. WIS. STAT. §§ 111.321, 111.322(1), 111.335. Section 111.32(1) defines "arrest record" as including, but not limited to:

> information indicating that an individual has been questioned, apprehended, taken into custody or detention, held for investigation, arrested, charged with, indicted or tried for any felony, misdemeanor or other offense pursuant to any law enforcement or military authority.

The first question before us is whether "any . . . other offense" includes non-criminal offenses.

¶13    To understand the parties' arguments, we begin by explaining the distinction between criminal and non-criminal offenses. Under Wisconsin law, offenses punishable by fine, imprisonment, or both are crimes, while offenses punishable only by a forfeiture are non-criminal. WIS. STAT. § 939.12. Non-criminal offenses range from minor infractions, like failing to use a turn signal, to more serious violations, like a first operating-while-intoxicated (OWI) offense.[3] Additionally, in Wisconsin, all crimes are classified as either felonies or misdemeanors. WIS. STAT. § 939.60. Some other jurisdictions, however, do not classify crimes in this way.[4]

---

[3] *See* WIS. STAT. §§ 346.36(1) (providing that the penalty for failing to use a turn signal is a forfeiture), 346.65(2)(am)1. (providing that the penalty for a first OWI offense is a forfeiture).

[4] *See, e.g.,* ME STAT. tit. 17-A, § 4 (2024) (classifying crimes in Maine as Class A–E); N.J. STAT. ANN. § 2C:1-4 (2024) (classifying crimes in New Jersey as first, second, third, or fourth degree); *Crimes Act 1900* (NSW) § 580E (Austl. 2023) (replacing "felony" and "misdemeanor" with "serious indictable offense" and

¶14    The District argues that the phrase "any . . . other offense" in § 111.32(1) refers only to criminal offenses under the laws of jurisdictions that do not classify crimes as either felonies or misdemeanors. Under this interpretation, the Cotas are not protected by the Act, since they were cited for a non-criminal offense. By contrast, the Cotas and LIRC assert that "any . . . other offense" includes both criminal offenses from jurisdictions that do not classify crimes as either felonies or misdemeanors and non-criminal offenses under Wisconsin law.

¶15    We agree with the Cotas and LIRC. The ordinary meaning of the phrase "any . . . other offense" includes violations of both criminal and non-criminal laws. Indeed, this is how the term "offense" is consistently used throughout our statutes, and nothing in the structure or remaining text of § 111.32(1) suggests a narrower meaning. Furthermore, interpreting "any . . . other offense" to include non-criminal offenses serves the Act's express statutory purpose of "protect[ing] by law the rights of all individuals to obtain gainful employment and to enjoy privileges free from employment discrimination because of . . . arrest record . . . ." WIS. STAT. § 111.31(2). Finally, the exceptions to the Act's general prohibition against arrest-record discrimination provide additional support for our interpretation.

A

¶16    Section 111.32(1) does not define the phrase "any . . . other offense," so "we look to [its] common, ordinary meaning . . . ." *See State v. Kizer*, 2022 WI 58, ¶12, 403 Wis. 2d 142, 976 N.W.2d 356. The word "offense" is a familiar term that is generally defined as "an infraction of the law," *Offense*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1566 (1976), or as "a transgression of law; a crime," *Offense*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 911 (1976). Standing alone, these definitions are broad enough to include both criminal and non-criminal offenses. After all, non-criminal laws are capable of being infracted or transgressed, just like criminal laws. Accordingly, the

"minor indictable offense," respectively, in the Australian state of New South Wales); HOPI CODE, tit. III, § 3.4.1 (2012) (classifying violations of the Hopi Tribe's criminal code as petty offenses, minor offenses, offenses, serious offenses, and dangerous offenses).

ordinary meaning of the phrase "*any . . . other* offense" in § 111.32(1) (emphasis added) includes all criminal and non-criminal offenses other than felonies and misdemeanors, both of which are already referenced in the definition of "arrest record."

¶17 Defining "any . . . other offense" to include both criminal and non-criminal offenses other than felonies and misdemeanors is consistent with how the term "offense" was used in other statutes in effect at the time the Act's definition of "arrest record" was adopted.[5] *See, e.g., Duncan v. Asset Recovery Specialists, Inc.*, 2022 WI 1, ¶12, 400 Wis. 2d 1, 968 N.W.2d 661 (relying on the usage of a common term in other statutes in effect when the statute at issue was adopted to support a plain-meaning interpretation). For example, Chapter 300 (Municipal Court Procedure) did not expressly define the term "offense" but used it many times to refer to non-criminal violations of municipal ordinances.[6] Chapter 346 (Rules of the Road) likewise left "offense" undefined. *See* WIS. STAT. §§ 346.01 (incorporating definitions from WIS. STAT. § 340.01), 340.01 (defining many terms, but not "offense"). Yet "offense" was used flexibly throughout Chapter 346 to refer to both criminal and non-criminal violations of law. *See, e.g.,* WIS. STAT. §§ 346.17(1) (using "offense" to refer to a violation punishable only by a forfeiture), 346.96(2)(b)5. (using "offense" to refer to crimes). Finally, in Chapter 165 (Department of Justice), "offense" was expressly defined to include both crimes and non-criminal violations of local ordinances. WIS. STAT. § 165.83(1)(c).

¶18 The structure and remaining text of § 111.32(1) further support giving "any . . . other offense" its ordinary meaning. Section 111.32(1) uses inclusive, rather than limiting, language: it states that an individual's arrest record "includes, but is not limited to," the types of information listed in the statute. It also includes within the arrest record information indicating that an individual has been "questioned, apprehended, taken into custody or detention, held for investigation, arrested, charged with, indicted or tried for *any* . . . other offense pursuant

---

[5] The definition of "arrest record" was added to the Wisconsin statutes in 1977. § 4, ch. 125, Laws of 1977. Accordingly, statutory citations in this paragraph are to the 1977–78 statutes.

[6] *See* WIS. STAT. §§ 300.02(5), 300.03(3), 300.04(1)(c), 300.04(2)(b), 300.09(2)(a), 300.10(4), 300.11(1)(c), 300.14(1).

to *any* law enforcement or military authority." *Id*. (emphasis added). The fact that the statute refers to "any" other offense brought by "any" law enforcement authority likewise supports an inclusive interpretation of "offense."[7] *See Marotz v. Hallman*, 2007 WI 89, ¶25, 302 Wis. 2d 428, 734 N.W.2d 411 (stating that the legislature's decision to modify a phrase with the word "any" indicates "broad application" when determining what falls within the scope of the provision).

¶19     The reference in § 111.32(1) to an arrest—a term most commonly associated with the criminal law—does not alter our conclusion. That is because Wisconsin law expressly authorizes arrests in connection with non-criminal offenses. Violations of traffic regulations and municipal ordinances are not crimes under Wisconsin law.[8] Yet, law enforcement officers can arrest individuals for violating traffic regulations. WIS. STAT. §§ 345.21–345.22. Likewise, WIS. STAT. §§ 800.02(5) and (6) permit law enforcement officers to arrest individuals for violating municipal ordinances. Additionally, the definition of "arrest record" itself is not limited to arrests—it includes information that an individual has been questioned, apprehended, taken into custody or detention, held for

---

[7] The District argues that "any . . . other offense" should be limited to crimes under the canon of construction *ejusdem generis*. *Ejusdem generis* provides that when a general word or phrase follows a list of specific words or phrases in a statute, "the general word or phrase will encompass only things of the same type as those specific words listed." *State v. Quintana*, 2008 WI 33, ¶27, 308 Wis. 2d 615, 748 N.W.2d 447. The District argues that because "other offense" is a general phrase following a list of specific words referring to criminal offenses ("felony" and "misdemeanor"), "other offense" should include only other types of criminal offenses. Canons of construction, however, are not inflexible rules and no single canon "will always take precedence over all other principles of construction." *State v. Rector*, 2023 WI 41, ¶¶33–34, 407 Wis. 2d 321, 990 N.W.2d 213. Here, the principles of statutory construction collectively favor our interpretation.

[8] Violations of traffic regulations are not crimes because they are punishable only by a forfeiture. *See* WIS. STAT. §§ 345.20(1)(b), 349.06(1)(a). Violations of municipal ordinances are not crimes because they are not violations of state law. WIS. STAT. § 939.12; *see also State v. Kramsvogel*, 124 Wis. 2d 101, 116, 369 N.W.2d 145 (1985) (concluding that the violation of a municipal ordinance is not a crime).

investigation, charged with, indicted, or tried for an offense. *See* WIS. STAT. § 111.32(1). Of all these actions, only indictment takes place exclusively in connection with criminal matters. The language and structure of § 111.32(1) thus support reading "any . . . other offense" to include both criminal and non-criminal offenses.

¶20    Lastly, reading "any . . . other offense" in § 111.32(1) to include non-criminal offenses is consistent with the Act's express purpose. When the legislature adopted the Act, it explained that its purpose was "to protect by law the rights of all individuals to obtain gainful employment and to enjoy privileges free from employment discrimination because of . . . arrest record . . . ." § 111.31(2). Interpreting the definition of "arrest record" to include non-criminal offenses furthers this purpose by ensuring that similar conduct results in similar protections, regardless of how it is charged.

¶21    For example, municipal ordinances often incorporate criminal statutes by reference.[9] Thus, the same conduct could be charged as either a crime or as a non-criminal municipal offense. Reading the prohibition on arrest-record discrimination to cover both situations, as we do, results in consistent protection against employment discrimination because of an arrest record. By contrast, under the District's proposed interpretation, whether discrimination is prohibited or not depends on whether law enforcement decides to charge the conduct under the ordinance or the corresponding statute.

¶22    Our interpretation also results in consistent treatment of OWI offenses. In Wisconsin, a first OWI offense is punishable only by a forfeiture, and is therefore non-criminal. WIS. STAT. §§ 346.63(1), 346.65(2)(am)1. Subsequent OWI offenses, however, must be charged as crimes. *See generally* § 346.65(2)(am). Under our interpretation, all employees investigated for OWI offenses are afforded the same protection from discrimination, consistent with the Act's purpose of protecting the rights of all individuals to be free from arrest-record discrimination. Under the District's interpretation, however, employees investigated for a first OWI offense would be afforded no protection from discrimination by

---

[9] The Town of Oconomowoc, for instance, had incorporated a variety of criminal statues into its municipal code at the time of the Cotas' citations. *See* TOWN OF OCONOMOWOC, WIS., CODE § 215-1 (2014).

their employers, while employees investigated for a second, third, or fourth OWI offense would be protected. Providing protection to alleged repeat offenders but not to alleged first-time offenders does not further the Act's purpose.

B

¶23 We derive further support for our interpretation from the exceptions to the Act's general prohibition on arrest-record discrimination and the exceptions to its closely related prohibition on conviction-record discrimination. *See* § 111.321. To understand why, it is helpful to begin by sorting these exceptions into two categories. The first is made up of exceptions applicable only to criminal charges. Within this category is, for example, an exception allowing employers to refuse to hire "any individual who is subject to *a pending criminal charge* . . . if the circumstances of the charge substantially relate to the circumstances of the particular job . . . ." § 111.335(2)(b) (emphasis added); *see also* § 111.335(4)(a).

¶24 The second category, however, includes exceptions that are not limited to criminal charges. One exception in this category provides that it is not arrest-record discrimination to request that an applicant or employee "supply information regarding . . . a record of *a pending charge*," without requiring that the charge be criminal. § 111.335(2)(a) (emphasis added). Another provides that it is not conviction-record discrimination[10] to refuse to employ or terminate from employment "any individual who has been convicted of *any offense* under s. 440.52(13)(c)." § 111.335(3)(f) (emphasis added). Offenses under § 440.52(13)(c) are non-criminal because they are punishable only by a forfeiture. *See id.*

---

[10] Although this is an exception only to conviction-record discrimination, it is relevant to our analysis because the Act's definition of "conviction record" uses language identical to the language at issue in this case: "information indicating that an individual has been convicted of any felony, misdemeanor, or other offense . . . pursuant to any law enforcement or military authority." WIS. STAT. § 111.32(3). Thus this provision is closely related to § 111.32(1) and should be read consistently with that section. *See Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611.

¶25　The District focuses narrowly on the exceptions applicable only to criminal charges, arguing that we should infer from them that the general prohibition on arrest-record discrimination similarly applies only to criminal offenses. But we must read statutes in context, "not in isolation but as part of a whole . . . ." *See Waukesha Cnty. v. E.J.W.*, 2021 WI 85, ¶27, 399 Wis. 2d 471, 966 N.W.2d 590 (quoting another source). Taken together, these exceptions demonstrate that "any . . . other offense" in § 111.32(1) includes both criminal and non-criminal offenses. After all, if the Act's general prohibitions on arrest- and conviction-record discrimination applied only to criminal offenses, then there would be no reason for the legislature to enact—in two consecutive paragraphs of the same subsection—exceptions applicable to "a pending charge" and "a pending *criminal* charge." *Compare* § 111.335(2)(a), *with* § 111.335(2)(b) (emphasis added). And there would be no need for exceptions applicable only to non-criminal offenses at all. *See* § 111.335(3)(f).

¶26　In sum, ordinary meaning, statutory context, and express statutory purpose all support the same conclusion: that "any . . . other offense," as it appears in § 111.32(1), includes non-criminal offenses. Accordingly, we hold that the Act's prohibition on arrest-record discrimination applies to both criminal and non-criminal offenses, including municipal theft.

IV

¶27　Because we hold that "any . . . other offense" in § 111.32(1) includes non-criminal offenses, we turn to the second issue before us: whether LIRC correctly concluded that the District terminated the Cotas because of their arrest records, in violation of the Act. The answer to this question turns on the District's motivation for terminating the Cotas, which is an issue of fact. *Currie v. DILHR*, 210 Wis. 2d 380, 386, 565 N.W.2d 253 (Ct. App. 1997) (citing *St. Joseph's Hosp. v. Wis. Emp. Rel. Bd.*, 264 Wis. 396, 401, 59 N.W.2d 448 (1953)).

¶28　We review agency findings of fact under the "substantial evidence" standard. *Hilton*, 293 Wis. 2d 1, ¶16; *see also* § 227.57(6). "Substantial evidence does not mean a preponderance of the evidence." *Id*. Instead, the test is "whether, after considering all the evidence of record, reasonable minds could arrive at the same conclusion" as the agency. *Id*. Here, LIRC found that the District's decision to terminate the Cotas was motivated by their municipal theft citations and by the assistant city attorney's statements that he believed he could convict the Cotas and

that he anticipated reaching a settlement agreement that included restitution—i.e., by components of the Cotas' arrest records.[11] While LIRC found that the District "believed, as a result of its internal investigation, that [the Cotas] may have stolen money," it also found that the District "was not persuaded of that conclusion to the point of being motivated to act" until it received the arrest-record information. We must accept these findings because they are supported by substantial evidence.

¶29 Substantial evidence supports LIRC's conclusion that the District was not motivated to act by its internal investigation, despite Casey's testimony before DWD that she formed a personal belief in the Cotas' guilt during the investigation. Indeed, Casey's report summarizing the results of the investigation stated that the District was not able to determine who was responsible due to conflicting allegations, and Casey testified before DWD that those same conflicting allegations prevented her from making final employment decisions at the close of the investigation. When referring the matter to the police for further investigation, the District's attorney told the investigator that the District could not conclude who was responsible, and Casey testified before DWD that this was a true statement. Finally, Casey also testified that while she was suspicious of the Cotas during the internal investigation, she was not suspicious enough to fire them.

¶30 Substantial evidence likewise supports LIRC's conclusion that the District's decision to terminate the Cotas was motivated by arrest-record information. Before DWD, Casey testified that three new pieces of information came to her attention between the close of her internal investigation—when she was not ready to fire the Cotas—and her decision to fire them nearly two years later. That new information included: (1) that the Cotas were cited for municipal theft, (2) that the assistant city attorney told Casey he believed he could convict the Cotas,

---

[11] The fact that the Cotas were cited for municipal theft is clearly part of their arrest records: § 111.32(1) defines "arrest record" to include information that an individual has been "charged with . . . any . . . other offense," and we held in Part III, *supra*, that "any . . . other offense" includes non-criminal offenses. The parties do not dispute that an assistant city attorney's statements that he believed he could convict and that he anticipated reaching a settlement agreement are part of an arrest record if they are related to a qualifying offense. As we held in Part III, *supra*, municipal theft is a qualifying offense.

and (3) that the assistant city attorney told Casey he anticipated reaching a settlement with the Cotas that included restitution. And Casey admitted that these three pieces of information caused her to terminate the Cotas. All three are components of the Cotas' arrest records. Accordingly, substantial evidence supports LIRC's conclusion that the District was motivated by arrest-record information when it terminated the Cotas.[12]

¶31 The District nevertheless argues that it is protected by the "*Onalaska* defense" because its decision to terminate the Cotas was motivated at least in part by Casey's belief in the Cotas' guilt formed during the internal investigation. *See generally City of Onalaska v. LIRC*, 120 Wis. 2d 363, 354 N.W.2d 223 (Ct. App. 1984). According to the District, *Onalaska* permits employers to terminate employees because of their arrest records as long as the employer also concludes from an internal investigation that the employee engaged in unacceptable conduct. In other words, the District argues that as long as it did not terminate the Cotas *exclusively* because of their arrest records, it did not violate the Act.

¶32 We reject this argument for two reasons. First, the District mischaracterizes the holding of *Onalaska*. In *Onalaska*, an employer effectively discharged[13] an employee after the employee admitted, in response to a question posed by the employer, that he had committed an offense. *Id*. at 364. The court of appeals held that "[i]f, as here, the employer discharges an employe[e] because the employer concludes from

---

[12] Additional evidence in the record further supports this conclusion. For example, Casey wrote in the Cotas' termination letters that they were being terminated because the District had "learned" that the Cotas "were, in fact, guilty of theft of funds from the School District . . . ." Casey testified before DWD that she wrote this statement solely because the police cited the Cotas and the assistant city attorney pursued the case against them. Casey also testified before DWD that the District decided to terminate the Cotas before a "final court disposition" because the District was satisfied with the assistant city attorney's representations about the proposed settlement agreement, and Casey agreed that "nothing besides those representations" had caused her to issue termination letters to the Cotas.

[13] The employer told the employee that if he did not resign, he would be fired, and the employee subsequently resigned. *Onalaska v. LIRC*, 120 Wis. 2d 363, 364, 354 N.W.2d 223 (Ct. App. 1984).

its own investigation and questioning of the employe[e] that he or she has committed an offense, the employer . . . does not rely on an arrest record . . . ." *Id.* at 367. Put another way, *Onalaska* holds simply that an employer who does not rely on arrest-record information when making a discharge decision does not discriminate against an employee because of their arrest record.

¶33    Second, *Onalaska* does not apply because LIRC found that the District *did* rely on arrest-record information when making its discharge decision, and we must accept this finding because it is supported by substantial evidence. This remains true even though the District argues that Casey's testimony about her personal belief in the Cotas' guilt supports a different conclusion about the District's motive. *See, e.g., Hamilton v. DILHR*, 94 Wis. 2d 611, 617, 288 N.W.2d 857 (1980) (explaining that we uphold agency factual findings that are supported by substantial evidence even if there is conflicting evidence in the record or multiple reasonable conclusions may be drawn); *see also* § 227.57(6) ("the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact."). LIRC weighed the evidence relevant to the District's motive and found that the District was motivated by the Cotas' arrest records. This finding is supported by substantial evidence, and therefore must be accepted.

¶34    Before we conclude, we clarify that the Act does not prohibit terminating employees with arrest records. Rather, it prohibits terminating employees *because of* their arrest records. *See* §§ 111.321, 111.322(1). The District thus did not lose its ability to terminate the Cotas by referring the matter to the police, and it remained free to terminate the Cotas after such a referral for any lawful reason. If the District in fact believed the Cotas were guilty independent of their arrest records, it could have terminated them because of that belief. But, as we have discussed, LIRC concluded that is not what happened here, and substantial evidence supports its conclusion. Accordingly, their termination violates the Act.

V

¶35    We conclude that the phrase "any . . . other offense," as it appears in § 111.32(1)'s definition of "arrest record," includes non-criminal offenses, like municipal theft. LIRC found that the District's decision to terminate the Cotas was motivated by their arrest records. Because this finding is supported by substantial evidence, we accept it, and therefore also affirm LIRC's decision that the District terminated the

Cotas because of their arrest records in violation of the Act.[14] Accordingly, we reverse the court of appeals' contrary decision.

    *By the Court.*—The decision of the court of appeals is reversed.

---

[14] LIRC ordered the District to cease and desist discriminating against the Cotas and awarded the Cotas reinstatement, back pay, and attorneys' fees. The District argues that the Cotas' remedy should be limited to the cease-and-desist order and attorneys' fees under the "mixed-motive analysis" adopted by the court of appeals. *See generally Hoell v. LIRC*, 186 Wis. 2d 603, 522 N.W.2d 234 (Ct. App. 1994). This Court has never decided whether the "mixed-motive analysis" applies to cases under the Act. However, even assuming it does apply, the Cotas' remedies need not be limited because LIRC found that the District would not have terminated the Cotas without their arrest records and this finding is supported by substantial evidence.

JANET C. PROTASIEWICZ, J., concurring.

¶36     In today's decision, the court follows the law where it leads, but we arrive at a strange result. I write separately to call attention to the oddity of this outcome and to recommend that our statutes better accommodate employers who are victims.

¶37     I agree with the majority that WIS. STAT. § 111.32(1) includes non-criminal offenses and that LIRC correctly concluded the District fired the Cotas because of their arrest records. But as a result of today's decision, the District may not fire employees who it suspects stole from the District. That is no way to treat the victim of an offense.

¶38     In the Wisconsin Fair Employment Act ("the Act"), the legislature balances a couple of interests. Surely, the legislature seeks to protect employees. *See* WIS. STAT. § 111.31(2) (setting out the legislature's intent to "protect by law the rights of all individuals to obtain gainful employment"). To that end, the Act prevents "employment discrimination because of" arrest record or conviction record, among other things. *Id.*

¶39     But the legislature also protects employers' interests in some instances. The legislature created exceptions that allow employers to sometimes take employment action in the context of an employee's arrest record or conviction. For example, an employer may suspend an employee when the employee is subject to a "pending criminal charge" if "the circumstances of the charge substantially relate to the circumstances of the particular job." WIS. STAT. § 111.335(2)(b). In another example, an employer may fire an employee who "has been convicted" of an offense under "circumstances . . . which substantially relate to the circumstances of the particular job." § 111.335(3)(a)1.

¶40     This case calls for another exception to protect employers when an employer is a victim. Here, the District was a victim, which makes this case different than many cases of arrest record discrimination. *See, e.g., City of Onalaska v. LIRC*, 120 Wis. 2d 363, 364, 354 N.W.2d 223 (Ct. App. 1984) (where an employee was charged with car racing and did not victimize the employer).

¶41     When an employer is a victim and suspects an employee, the employer has good reason to take employment action against that employee. That's true here: The District completed an internal investigation and found that money had been stolen from the District. And the HR Director believed the Cotas stole the money. Further, the HR

Director wrote: "There can be no question that some employment action (and perhaps criminal action) is necessary here." No party disputes that the District could have fired the Cotas at this point.[1]

¶42    Still, the HR Director worried that "[t]he District [did] not have the investigation authority to carry [the] investigation further." Thinking that "[e]mployment-related disciplinary decisions can be better made following the conclusion of any criminal investigation," the District turned over the investigation to law enforcement.

¶43    The District made a prudent decision when it handed its investigation to law enforcement. The District sought more information before making a decision that could upend its employees' lives. Maybe law enforcement would exonerate the Cotas and give the District reason to retain them. Or maybe the investigation would provide assurance that the Cotas stole from the District. Either way, the District could be more confident in its action.

¶44    But by reaching out to law enforcement and generating an arrest record, the District limited its employment options. Once the Cotas had an "arrest record," the Act barred the District from taking employment action because of the arrest record. *See* WIS. STAT. §§ 111.321, 111.322(1). And the Act's exceptions did not apply. The District could not suspend the Cotas under the exception in WIS. STAT. § 111.335(2)(b).[2] And the District could not fire them under the exception in § 111.335(3)(a)1. because the Cotas' case was resolved without a conviction.

¶45    So we are left with a strange result. The District was the victim of an offense and suspected its employees did it. It could have fired the employees, but instead asked law enforcement to investigate. Because

---

[1] According to the District, it employed the Cotas "on an 'at will' basis . . . at the sole discretion of the School District." And "[i]n general, at-will employees are terminable at will, for any reason, without cause and with no judicial remedy." *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶8, 254 Wis. 2d 347, 646 N.W.2d 365.

[2] The exception in WIS. STAT. § 111.335(2)(b) applies when employees are subject to a pending "criminal charge," and the Cotas were subject to non-criminal charges.

law enforcement investigated, the employees had an arrest record which limited the District's ability to fire the employees. In the end, under today's decision, the District may not fire the employees that it believes stole from the District.

¶46   Our statutes should not hamstring employers who are victims that way. An employer should be allowed to take employment action when it is the victim of an offense and suspects an employee did it, even when it relies on information from law enforcement.

¶47   Nevertheless, I must follow the law as it stands, and I agree with the majority: The text of WIS. STAT. § 111.32(1) includes non-criminal offenses, and LIRC correctly concluded that the District fired the Cotas because of their arrest records. But this case highlights how our statutory scheme breaks down when an employer is the victim of an offense and seeks law enforcement intervention. I urge the legislature to address this unjust situation.

¶48   For the foregoing reasons, I respectfully concur.

ANNETTE KINGSLAND ZIEGLER, C.J., dissenting.

¶49     The court's decision sends a message to employers across the state: If the employer believes one of its employees may have committed a crime—say, stealing from that employer—based upon its own internal investigation, it should quickly fire the employee rather than have its suspicions confirmed by a full investigation by law enforcement. The court's decision forecloses an employer from firing such an employee even when the employer's suspicions about the employee's conduct are confirmed by law enforcement's investigation. Maybe this case is an example of the "old adage" that "bad facts make bad law,"[1] but the upshot of the court's decision is directly at odds with the legislatively enacted purpose of the statutes at issue. These statutes were enacted to protect employees from unwarranted termination. But today's opinion will ensure the opposite: Employers can no longer give their employees the benefit of the doubt, allowing law enforcement to confirm their suspicions, because that could mean the employer will risk liability under the law. Accordingly, I dissent.

¶50     The Wisconsin Fair Employment Act[2] (the Act) bars employers from engaging in certain forms of employment discrimination. With some exceptions, an employer may not "discriminat[e]" against an individual "on the basis of . . . arrest record[s]." Wis. Stat. § 111.321. WISCONSIN STAT. § 111.322(1) provides that discrimination includes "terminat[ing] from employment . . . any individual . . . because of" an individual's arrest record. In turn, "arrest record" is statutorily defined as including, but not being limited to, "information indicating that an individual has been questioned, apprehended, taken into custody or detention, held for investigation, arrested, charged with, indicted or tried for any felony, misdemeanor or other offense pursuant to any law enforcement or military authority." WIS. STAT. § 111.32(1).

¶51     When this court interprets statutes, we look to the language of the statutes: "[S]tatutory interpretation begins with the language of the statute[.]" *Teschendorf v. State Farm Ins. Cos.*, 2006 WI 89, ¶12, 293

---

[1] *State ex rel. Singh v. Kemper*, 2016 WI 67, ¶141, 371 Wis. 2d 127, 883 N.W.2d 86 (Ziegler, J., concurring in part, dissenting in part).

[2] WISCONSIN STAT. §§ 111.31–111.395.

Wis. 2d 123, 717 N.W.2d 258. But "[w]hen the legislature has expressly stated the purpose of a statute, the purpose is relevant to the plain meaning interpretation of the statute." *Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, ¶21, 367 Wis. 2d 386, 879 N.W.2d 492 (citation omitted).[3] That is because legislatively enacted purposes are a part of a statute's context. *See State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶48, 271 Wis. 2d 633, 681 N.W.2d 110 (stating "scope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself"). Here, the legislature expressly stated the purpose of the Act in WIS. STAT. § 111.31. Importantly—as this court has explained countless times—statutes are to be interpreted in a manner that "ensures [] a text's manifest purpose is furthered, not hindered." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012).[4] The result the court reaches in this case is in direct conflict with the legislatively provided purpose of the Act.

¶52 The legislature affirmatively and expressly declared the purpose and policy of the Act; it is to protect employees from termination

---

[3] *See also Milwaukee Police Ass'n v. City of Milwaukee*, 2018 WI 86, ¶29, 383 Wis. 2d 247, 914 N.W.2d 597 (stating that "[t]he purpose of a statute informs our interpretation of statutory terms" (citing *McNeil v. Hansen*, 2007 WI 56, ¶16, 300 Wis. 2d 358, 731 N.W.2d 273)); WILLIAM N. ESKRIDGE JR., INTERPRETING LAW 105 (2016) (stating "judge[s] ought to interpret statutory provisions in light . . . of the legislative purposes and objectives").

[4] *See also State v. Williams*, 2014 WI 64, ¶17, 355 Wis. 2d 581, 852 N.W.2d 467 (stating "'a plain-meaning interpretation cannot contravene a textually or contextually manifest statutory purpose'" (quoting *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶49, 271 Wis. 2d 633, 681 N.W.2d 110)); *State v. Wiskerchen*, 2019 WI 1, ¶21, 385 Wis. 2d 120, 921 N.W.2d 730 (stating this court "'favor[s] a construction that fulfills the purpose of the statute over one that defeats statutory purpose'" (quoting *Westmas v. Creekside Tree Serv., Inc.*, 2018 WI 12, ¶19, 379 Wis. 2d 471, 907 N.W.2d 68)); *Wis. Indus. Energy Grp., Inc. v. Pub. Serv. Comm'n*, 2012 WI 89, ¶15, 342 Wis. 2d 576, 819 N.W.2d 240 (stating "courts will favor an interpretation of statutory language that fulfills the statute's purpose" (citing *State v. Hanson*, 2012 WI 4, ¶17, 338 Wis. 2d 243, 808 N.W.2d 390)); *State v. Ziegler*, 2012 WI 73, ¶43, 342 Wis. 2d 256, 816 N.W.2d 238 (stating an interpretation of a statute is "unreasonable" if it "contravenes the statute's manifest purpose" (citation omitted)).

under a variety of circumstances, including when an employer wishes to terminate an employee because that employee has an arrest record.[5] It is the

> public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of age, race, creed, color, disability, marital status, sex, national origin, ancestry, sexual orientation, arrest record, conviction record, military service, use or nonuse of lawful products off the employer's premises during nonworking hours, or declining to attend a meeting or to participate in any communication about religious matters or political matters.

WIS. STAT. § 111.31(3). The court's decision contravenes the legislatively stated purpose of the Act. Here, had the employer not given the employees the benefit of the doubt and asked law enforcement to investigate that which the employer had already determined, and instead fired the employees before law enforcement determined the employees should be charged, the employer would not be liable. If the employer fired the employees earlier, no liability would have attached because no arrest records would have existed. Simply stated, waiting to have law enforcement confirm the employer's suspicions meant that the employer was liable. So, instead of protecting the employment of employees, the Act, as the court interprets and applies it, promotes the premature firing of employees suspected of committing offenses.[6] Stated otherwise, the court renders the Act self-defeating in factual situations like these.

---

[5] *See* WIS. STAT. § 111.31(2) (providing that "[i]t is the intent of the legislature to protect by law the rights of all individuals to obtain gainful employment and to enjoy privileges free from employment discrimination because of age, race, creed, color, disability, marital status, sex, national origin, ancestry, sexual orientation, arrest record, conviction record, military service, use or nonuse of lawful products off the employer's premises during nonworking hours, or declining to attend a meeting or to participate in any communication about religious matters or political matters, and to encourage the full, nondiscriminatory utilization of the productive resources of the state to the benefit of the state, the family, and all the people of the state").

[6] On the other hand, firing an employee too quickly may expose the employer to liability for wrongful discharge. The issue of wrongful discharge is

¶53 The majority suggests that employers need not worry because "the Act does not prohibit terminating employees with arrest records." Majority op., ¶34. The majority says an employee can be terminated if an arrest record is not the basis for termination. *Id.* But the majority comes to the wrong conclusion in this case, ensuring its words will be cold comfort to employers. Here, it was the employees stealing from the employer—not their arrest records—that formed the basis for the termination of the employees. The arrest records were mere technicalities after the employer already believed the employees had stolen from it. Law enforcement merely confirmed that belief with its investigation.[7] That is, the employees' conduct was the basis for the termination. Yet somehow the majority believes that the arrest records were the basis for the firing. The majority's conclusion flouts common sense and insists upon the unbelievable. What employer would care about whether its employee has an arrest record when that employer already believes that its employee has stolen from it?

¶54 Although the majority places heavy emphasis on the words *"because of," id.*, the court never defines what those words mean for purposes of arrest record discrimination, *see id.*, ¶35 n.14. Employers are left to guess what might trigger liability under the Act. But it now seems what triggers liability is quite sweeping. In light of the court's failure to define when liability attaches, employers will be left in an untenable position, needing to terminate promptly before an arrest record comes into being.

¶55 In its attempt to downplay the implications of its decision, *see id.*, ¶33, the majority ignores the significance of the standard of review it applies, *see id.*, ¶¶28–30, 33 (applying the substantial evidence

---

not raised or addressed in this case, *see State v. Pal*, 2017 WI 44, ¶26, 374 Wis. 2d 759, 893 N.W.2d 848 (this court does not generally construct arguments on behalf of the parties), but the majority appears to needlessly place employers in a lose-lose situation. Fire an employee too quickly? The employer may be liable for wrongful discharge. Fire an employee after the employee gets an arrest record? The employer will be liable under the Act for arrest record discrimination.

[7] *See* Justice Rebecca Grassl Bradley's dissent, ¶¶67, 70.

standard).[8] Judicial review of the Labor and Industry Review Commission's (LIRC) factual findings is "limited." *Wis. Bell, Inc. v. LIRC*, 2018 WI 76, ¶30, 382 Wis. 2d 624, 914 N.W.2d 1; *Hilton ex rel. Pages Homeowners' Ass'n v. DNR*, 2006 WI 84, ¶25, 293 Wis. 2d 1, 717 N.W.2d 166 (explaining that the substantial evidence standard "affords significant deference to an agency's factual findings"). Courts are to uphold LIRC's factual findings provided a reasonable person could come to the same conclusion as the agency. *Hilton*, 293 Wis. 2d 1, ¶16.[9] And "'the weight and credibility of the evidence are for the agency, not the reviewing court, to determine.'" *Id.*, ¶25 (quoting *Sterlingworth Condo. Ass'n, Inc. v. DNR*, 205 Wis. 2d 710, 727, 556 N.W.2d 791 (Ct. App. 1996)).

¶56   The wrongful deference the majority gives to LIRC's factual findings in this case demonstrates the unlikelihood that courts will reverse a finding by LIRC that an employer terminated an employee because of the employee's arrest record. Here, the facts demonstrate that the employees were terminated because they stole from the employer, not because they had arrest records. But the majority upholds LIRC's erroneous finding all the same.

¶57   While the court might be technically correct that merely having an arrest record is insufficient to trigger liability under the Act, majority op., ¶34, under circumstances presented in a case like this one, the mere existence of an arrest record seems to be sufficient for LIRC to find an employer liable. Employers will act accordingly and fire their employees after an internal investigation, even if the investigation is inconclusive, before law enforcement gets involved. Employers cannot risk the possibility that LIRC will make the inference—which after today's opinion will be all too easy to make—that the employer fired its employee

---

[8] As Justice Rebecca Grassl Bradley correctly observes in her dissent, the majority erroneously treats a legal question—whether the employer terminated the employees because of their arrest records—as a factual one. *Id.*, ¶61.

[9] *See also* WIS. STAT. § 227.57(6) ("If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.").

because of the employee's arrest record, not the employer's prior internal investigation. *See DOR v. A. Gagliano Co.*, 2005 WI App 170, ¶32, 284 Wis. 2d 741, 702 N.W.2d 834 (stating that "if the evidence supports more than one reasonable inference, the agency's inference is conclusive" (citing *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶25, 264 Wis. 2d 200, 664 N.W.2d 651)).

¶58    No doubt, the court's decision is a victory for Gregory and Jeffrey Cota. But the decision may ultimately prove to be a defeat for employees across Wisconsin. The stated purpose of the Act is to protect employees from unwarranted termination. Here, the employees were terminated because they stole from their employer. Yet, according to the majority, the employer's hands were tied when it came to terminating them. Had the employer terminated the two employees sooner, there would be no arrest records and the employer would face no liability. The outcome of this case turns the stated purpose of the Act upside down—pushing employers to terminate employees as quickly as possible to avoid the risk of liability under the Act. The legislature did not intend the statute to operate in this manner.

¶59    For the foregoing reasons, I respectfully dissent.

REBECCA GRASSL BRADLEY, J., with whom ANNETTE KINGSLAND ZIEGLER, C.J., joins, dissenting.

¶60    The Oconomowoc Area School District suspected two of its employees, Gregory and Jeffrey Cota, of stealing from the District, and ultimately fired both of them after the Oconomowoc Police Department cited the Cotas for theft. The Labor and Industry Review Commission ("LIRC") determined the District unlawfully terminated the Cotas because of their arrest records—not their thievery—and ordered the District to reinstate the Cotas, give the Cotas back pay, and pay the Cotas' attorney fees. The majority won't disturb LIRC's decision because, according to the majority, "substantial evidence" supports LIRC's "finding" that the District terminated the Cotas "because of their arrest records." Majority op., ¶35.

¶61    The majority mistakes a conclusion of law for a finding of fact.  Whether an employer unlawfully terminated an employee based on his arrest record is a conclusion of law, as LIRC's Order properly denominated it:

> Conclusion of Law
> 1.     The complainants were discriminated against based upon their arrest records, in violation of the [Wisconsin Fair Employment] Act.

*Cota v. Oconomowoc Area Sch. Dist.*, Nos. CR201700245 & CR201700246 (LIRC, July 30, 2021). Whether the facts found by an agency "fulfill a particular legal standard is a question of law, not a question of fact." *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶39, 382 Wis. 2d 496, 914 N.W.2d 21 (citation omitted); *see also Cree, Inc. v. LIRC*, 2022 WI 15, ¶13, 400 Wis. 2d 827, 970 N.W.2d 837 ("Whether the facts of a case fulfill a legal standard is also a matter of law we review de novo."). By misapprehending a question of law for one of fact, the majority sidesteps its responsibility to declare the law and effectively endorses LIRC's misinterpretation of the governing statute to shield employees from any adverse employment consequences for their malfeasance.

¶62    Even if the issue of whether the District fired the Cotas based on their arrest records presented a factual question, no reasonable person would conclude the District fired the Cotas for any reason other than the fact the Cotas stole from their employer. It is preposterous to suggest the District fired the Cotas based on their status as persons with

1

arrest records. Nothing in the law compels this court to reward the offenders and punish the victim. Only the majority's tacit approval of LIRC's crabbed reading of statutory law produces this farce.[1]

¶63　The Wisconsin Fair Employment Act ("the Act") prohibits employers from discriminating against individuals "on the basis of" their "arrest record," among other bases such as race or sex. WIS. STAT. § 111.321. Termination of employment constitutes a discriminatory action the law prohibits if taken "on the basis of" an arrest record. WIS. STAT. § 111.322(1). LIRC concluded the District terminated the Cotas on the basis of their arrest records because the District waited to fire them until law enforcement created arrest records validating the District's conclusions. This hyper-literal construction of the Act contradicts the statute's textually manifest purpose and assigns the law an unsound meaning.

¶64　The Wisconsin Legislature expressed in the text of the Act the policy underlying its prohibition of discrimination "on the basis of" an individual's "arrest record":

> The legislature finds that the practice of unfair discrimination in employment against properly qualified individuals by reason of their . . . arrest record . . . substantially and adversely affects the general welfare of the state. Employers . . . that deny employment opportunities and discriminate in employment against properly qualified individuals *solely because of* their . . . arrest record . . . deprive those individuals of the earnings that are necessary to maintain a just and decent standard of living.

WIS. STAT. § 111.31(1) (emphasis added). The legislature explained, in no uncertain terms, that it wished "to encourage employers to evaluate an employee or applicant for employment based upon the individual qualifications of the employee or applicant *rather than upon a particular*

---

[1] The concurrence laments the "strange result" the court reaches but scolds *the legislature* for how "the statutory scheme breaks down." Concurrence, ¶¶45–47. The concurrence is as misguided as the majority. It is members of this court who have "broken" the law the legislature enacted. The law was just fine until it reached this court.

*class to which the individual may belong.*" WIS. STAT. § 111.31(2) (emphasis added).

¶65    Soon after the legislature decided to protect people from employment discrimination based on their status as individuals with arrest records, the court of appeals recognized "the legislature amended the [] Act . . . to include an arrest and conviction record as a prohibited factor of discrimination in employment" for the purpose of securing an "ex-offender his . . . right[] to compete in the employment marketplace free from arbitrary and stigmatic determination made on the basis of a criminal record which bears no 'substantial relationship' to the employment." *Miller Brewing Co. v. DILHR.*, 103 Wis. 2d 496, 500, 504, 308 N.W.2d 922 (Ct. App. 1981). Under any view of the facts, no one could suggest the District made an "arbitrary and stigmatic determination" on the basis of the Cotas' arrest record and no one could reasonably dispute the District fired the Cotas because they stole from the District. The majority doesn't even consider the meaning of the statutory text and instead reviews the factual record for reasons to sustain LIRC's decision. Because LIRC got the law wrong, the majority's analysis is useless.

¶66    Even under the majority's misguided framework of examining the record for substantial evidence supporting LIRC's decision, there is no evidence the District unlawfully discriminated against the Cotas. No evidence, much less substantial evidence, suggests the District fired the Cotas "solely because of" their arrest records. Nothing in the record suggests the District fired the Cotas because of the "particular class to which" the Cotas belong: individuals with arrest records. Everything in the record points to the District firing the Cotas for the obvious reason that the Cotas stole from the District.

¶67    Consider the evidence. The District's Director of Human Resources, Pam Casey, testified she believed the Cotas had stolen from the District and had lied during her investigation. She denied her conclusion was based on what she learned from the police investigation or prosecuting attorney, stating, "I had my own opinion during my own questioning of everyone involved." Casey further testified that any information gleaned from the Cotas' arrest records was merely corroborative of her original belief in the Cotas' guilt. Nothing in the record suggests Casey terminated the Cotas solely because of their arrest records. LIRC's contrary conclusion is impossible, considering Casey formed her belief that the Cotas had stolen from the District *before* law enforcement's involvement. In an effort to afford its employees a fair

process, the District simply waited for law enforcement's investigation to substantiate the District's own conclusions.

¶68     LIRC circumvents the obvious by adopting a hyper-literal interpretation of the Act, penalizing employers for exercising due diligence in turning an investigation over to law enforcement before firing employees. According to LIRC, if an employer fires an employee only after the "arrest record" corroborates the employer's investigation, then the employer unlawfully terminated the employee "because of" his arrest record. This court recently rejected such strict constructionism. "Properly applied, the plain-meaning approach is not 'literalistic'; rather, the ascertainment of meaning involves a 'process of analysis' focused on deriving the fair meaning of the text itself." *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1 (citations omitted). LIRC missed the fair meaning forest for the literalistic trees, producing a preposterous distortion of the law. It is this court's responsibility to correct this legal error.

¶69     In *City of Onalaska v. LIRC*, 120 Wis. 2d 363, 367, 354 N.W.2d 223 (Ct. App. 1984), the court of appeals explained that if "the employer discharges an employe because the employer concludes from its own investigation and questioning of the employe that he or she has committed an offense, the employer does not rely on information indicating that the employe has been questioned, and therefore does not rely on an arrest record . . . ." Under those circumstances, a discharge is not discriminatory. As *Onalaska* explains, employees with arrest records do not receive per se immunity from discharge under the Act. Instead, "an employer does not improperly discharge an employee based on an arrest record if the employer concludes from its own independent investigation and questioning of the employee that the employee has, in fact, committed an offense." *Vega v. LIRC*, 2022 WI App 21, ¶38, 402 Wis. 2d 233, 975 N.W.2d 249 (citing *Onalaska*, 120 Wis. 2d at 367). For four decades, the courts and LIRC have recognized and applied what has become known as the "*Onalaska* defense."

¶70     In this case, the arrest records came about only after Casey believed the Cotas stole from the District and then referred the matter to law enforcement. After completing her investigation, Casey concluded "[t]here can be no question that some employment action (and perhaps criminal action) is necessary here, in view of the evidence that this investigation has produced." Only then did the District refer the matter to law enforcement. Casey later testified "[t]he independent police

investigation . . . resulting in the issuance of the municipal theft citations, further *corroborated* in my mind the fact that these individuals were not forthright and had lied during our investigation and had taken proceeds from the sale of scrap metal." The record confirms the Cotas' arrest records merely corroborated conclusions the employer had already drawn.

¶71    The majority misreads *Onalaska*, saying it holds "simply that an employer who does not rely on arrest-record information when making a discharge decision does not discriminate against an employee because of their arrest record." Majority op., ¶32. Obviously, if the employer did not rely on the arrest record, then the discharge decision could not possibly be "on the basis of" the arrest record. As understood and applied by this court, the court of appeals, and LIRC in later cases, *Onalaska* stands for something more than the majority's circular statement.

¶72    In *County of Dane v. Norman*, 174 Wis. 2d 683, 692, 497 N.W.2d 714 (1993), this court expounded the *Onalaska* defense as differentiating between unlawful discrimination based on an individual's status versus a permissible termination in response to an employee's conduct, applying the distinction in a fair housing discrimination case. It explained the *Onalaska* decision upheld an employee's discharge "on the ground that the employer relied on the underlying *conduct* of the employee, racing on a public highway, rather than merely his *status* as a person with a record of arrest, which resulted from that *conduct*." *Id.* (emphasis added). So too with the District, which obviously terminated the Cotas for their misconduct, irrespective of their status as persons with arrest records. In this case, LIRC erred by misclassifying an adverse employment decision based on conduct as status-based discrimination, eliminating a long-recognized distinction between the two.

¶73    In earlier cases, LIRC properly applied the *Onalaska* defense. In *Foley v. Cost Cutters*, No. CR201203538 (LIRC, Jan. 15, 2015), LIRC understood an employer lawfully may fire an employee even if the employer learns of the employee's arrest record. LIRC explained: "[t]he fact that an employer had knowledge of an employee's arrest before it took some adverse action does not imply that the arrest caused the employer to take the adverse action." *Id.* (citation omitted). LIRC further recognized that corroborating information gleaned from an arrest record does not defeat an *Onalaska* defense: "the fact of the [employee's] arrest provided some corroboration of the [employer's] belief that the [employee] had been shoplifting . . . , but it is clear that the [employer's]

belief arose from its own investigation and conversations with [its] personnel, not from the fact of the [employee's] arrest." *Id.*

¶74　In *Sanford v. Luther Midelfort*, LIRC reiterated that the viability of the *Onalaska* defense survives so long as an employer's knowledge of an employee's arrest record is not the sole basis for the employer's action against the employee:

> *Onalaska* and its progeny do not require that the [employer] have no knowledge of or familiarity with an arrest record, but instead that this not be the sole or primary basis upon which the [employer] formed its belief that the [employee] had engaged in the underlying conduct. . . . "[I]t is when the fact of the arrest is the 'one source and only source' for [the employer's] belief in the [employee's] guilt, that *Onalaska* does not apply."

No. CR200704413 (LIRC, Oct. 1, 2010) (quoting *Delapast v. Northwoods Beach Home Caring Homes*, No. 8901907 (LIRC, Feb. 17, 1993)). This case fits squarely in *Sanford*'s description of *Onalaska*. The arrest record information was not the sole source for the District's belief in the Cotas' guilt; rather, the District formed its belief that the Cotas stole from it before any arrest records existed and those records merely corroborated the District's conclusions after its own investigation.

¶75　Nothing in the Act compels LIRC to penalize an employer for waiting to terminate an employee until law enforcement corroborates the employer's conclusion that an employee stole from the employer. The Act prohibits an employer from terminating an employee "on the basis of" his arrest record, but an employer can certainly terminate an employee because he stole from the employer. The court of appeals confirmed that interpretation in *Onalaska* and LIRC has applied it repeatedly.

¶76　In this case, LIRC adopted a new, narrow, and strict construction of the Act, ignored its context and textually expressed purpose, and rejected decades of cases interpreting the law correctly. The majority refuses to apply the obvious meaning of "on the basis of" and instead improperly defers to LIRC's *legal* conclusion, mischaracterizing it as an issue of fact. While the court may be bound by LIRC's findings of fact, it is supposed to independently interpret the law. *See Tetra Tech*, 382 Wis. 2d 496, ¶39. Although the court could correct LIRC's error of law and apply the Act's actual meaning to the facts as found by LIRC—the most

efficient disposition of this litigation—at a minimum the court should remand the matter to LIRC to decide the case under the correct interpretation of the law. *See Wisconsin Bell, Inc. v. LIRC*, 2018 WI 76, ¶29, 382 Wis. 2d 624, 914 N.W.2d 1 (quoting WIS. STAT. § 227.57(5)) ("[After conducting its] review, '[t]he court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.'").

¶77 Instead, the majority carelessly embraces LIRC's misunderstanding of a statute that prohibits categorical discrimination against individuals merely because they have an arrest record. Nothing in the text of the law protects employees accused of committing crimes against their employers. The majority's improper deference to LIRC's misinterpretation of the Act will perversely incentivize employers to fire employees without investigating accusations or suspicions against them, lest law enforcement's later involvement trigger the indemnity the majority confers on employees suspected of misconduct. Nothing in the law necessitates this ludicrous situation, which is of the majority's own making. I dissent.